1

2

3

4                                                        **E-FILED on** __4/16/2008__

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                              SAN JOSE DIVISION

12

13

DWIGHT WATSON; DANIEL FARIAS;            No. C-06-07767 RMW
LAUREN WATSON; and NICOLE WATSON,
                                         ORDER DENYING AGENT ALBIN'S AND
        Plaintiffs,                      AGENT RUBINO'S MOTIONS FOR
                                         SUMMARY JUDGMENT
        v.
                                         **[Re Docket Nos. 68, 70]**
GLENN ALBIN; DAVID MENDEZ; FRANK
ST. CLAIR; MIKE D'ANTONIO; MIKE
RUBINO; SANTA CLARA COUNTY;
STATE OF CALIFORNIA, and DOES 1-50,

        Defendants.

21          This case arises from a probation search conducted by the Santa Clara County Specialized

22   Enforcement Team ("SCCSET").  The plaintiffs are Dwight Watson and his three children: his

23   stepson Daniel Farias and his daughters Lauren and Nicole Watson.  The only remaining defendants

24   in the case are agents Glenn Albin, David Mendez, Mike D'Antonio, and Mike Rubino.[1]  Agents

_____

[1]      The court granted the State of California's motion to dismiss on Eleventh Amendment
grounds.  *See* Docket No. 32, C-06-07767-RMW (N.D. Cal. May 24, 2007).  The plaintiffs have
since stipulated to dismiss their case against Santa Clara County and Frank St. Clair.  *See* Docket
Nos. 110, 111.

United States District Court
For the Northern District of California

1    Albin and Rubino move for summary judgment on various claims directed against them.  Agents

2    Mendez and D'Antonio do not move for summary judgment.  The plaintiffs oppose the motions.

3    The court has read the papers and considered the arguments of counsel.  For the reasons set forth

4    below, the court denies the motions for summary judgment.

## I.  BACKGROUND

### A.    Events Leading Up to the Incident at the Watson Home

7         Over the course of October 2005, SCCSET agents believed that Curtis Farias was selling

8    narcotics out of a home at 74 Decorah Lane in Campbell, California ("the Watson home").

9    *See* Docket No. 93, Decl. of K.C. Allan Waldron ("Waldron Decl."), Ex. C at 6:8-9.  Agent David

10   Mendez discovered that Mr. Farias had two probation grants for narcotics violations.  *Id.*, at 6:9-11.

11   Accordingly, he held an operation briefing on October 25, 2005, which included Agents Albin,

12   D'Antonio, Rubino, and St. Clair.  *Id.*, at 6:12-13.  In the briefing, the agents discussed who lived in

13   the home and recognized that it was a multi-generational home and that there would be children

14   present.  Waldron Decl., Ex. D at 28:2-12.

15        After the briefing, Agents Rubino and D'Antonio surveilled the Watson home around 5:15 in

16   the evening.  *Id.*, at 6:17-18, 24-25; *see also* Docket No. 68-2, Decl. of Mike Rubino ¶ 4 ("Rubino

17   Decl.").  Upon seeing Curtis Farias leave around 6:50, Agents Rubino and D'Antonio followed,

18   stopped, and detained him.  Waldron Decl., Ex. C at 6:18-25; Rubino Decl. ¶ 5.  Following Curtis

19   Farias' arrest, the agents held a field briefing before conducting the search.  *See* Waldron Decl., Ex.

20   E at 69:1-5.  The briefing covered information gleaned from Curtis Farias about who would be in the

21   house and specifically covered that children would be present.  *Id.* at 69:20-70:8.  Based on their

22   questioning of Curtis Farias, the SCCSET believed there would be nine people inside the house and

23   that they would find methamphetamine on the premises.  Waldron Decl., Ex. G at 2:18-20.

24        The SCCSET agents were clad in "full raid gear," consisting of blue jeans and a black shirt

25   and vest with the word "POLICE" on the front and back.  Rubino Decl. ¶ 6.  The agents approached

26   the house and detained two young men who were standing in front of the garage door.  Waldron

27   Decl., Ex. C at 6:27-30.  Agent Mendez then repeatedly knocked on the front door, shouting "Police

28

1  offers, probation search open the door!" *Id.* at 6:30-32. Lauren Watson opened the door within ten

2  seconds, at which point Agent Mendez entered the home and escorted her to the living room. *Id.* at

3  6:32-36.

4  **B.    What Happened Inside the Watson Home?**

5  **1.    Agent Mendez's Report**

6  Agent Mendez encountered Margaret Farias (Mr. Watson's alleged common law wife) as he

7  entered the hallway and ordered her to approach. Waldron Decl., Ex. C at 6:38-7:2. As she did so,

8  Mr. Watson emerged from the master bedroom and shouted "what the hell is going on?" *Id.* at 7:3-5.

9  Mr. Watson passed Margaret and continued to question Agent Mendez, until he blocked the entry to

10  the house. *Id.* at 7:6-10. At this point, Agent Albin grabbed Mr. Watson's left arm and forcibly

11  pulled him into the kitchen. *Id.* at 7:10-14.

12  Mr. Watson yelled at Agent Albin and jerked his arm away from him, looking as though he

13  would hit Agent Albin. *Id.* at 7:15-18. Meanwhile, Daniel Farias emerged from a room and into the

14  hallway, shouted "What are you doing that's my dad!" and ran toward Agent Albin and Mr. Watson.

15  *Id.* at 7:20-22. Agent St. Clair grabbed Daniel Farias to prevent him from interfering and physically

16  detained him on the hallway floor. *Id.* at 7:22-25. Agent Mendez then helped Agents Albin and

17  Rubino with the detention of Mr. Watson. *Id.* at 7:25-27.

18  Agent Mendez's report states that Agent Albin's right wrist, elbow, and shoulder were

19  injured, and that an x-ray of Agent Albin's wrist revealed a possible spiral fracture. *Id.* at 7:29-34.

20  Mr. Watson obtained "minor injury to his mouth and a complaint of pain to his back." *Id.* at 7:36-

21  37. Mr. Watson complained about pain to his back, but refused medical aid from fire department

22  members and refused to be transported by paramedics. *Id.* at 7:36-8:4.

23  Agent Mendez then searched the home. *Id.* at 8:8. In Curtis Farias's bedroom, he found

24  assorted drug paraphernalia, two small ziplock baggies of marijuana, various narcotic pills, two

25  scales, and other potential contraband. *Id.* at 8:13-37.

26  **2.    Agent Albin's Declaration and Report**

27

28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Agent Albin states that once the SCCSET entered the Watson home, Mr. Watson was

2  "visibly angry and hostile" and repeatedly yelled "what the hell is going on."  Docket No. 71, Decl.

3  of Glenn Albin ¶ 10(a) ("Albin Decl.").  Agent Albin yelled "probation search" and ordered Mr.

4  Watson to approach him.  *Id.*  Mr. Watson continued to yell as he approached him and yelled "I ain't

5  on probation." *Id.*  Due to the close confines of the hallway and Mr. Watson's baggy clothing, Agent

6  Albin did not feel safe and feared that Mr. Watson might have a weapon in his waistband.  *Id.* ¶

7  10(b).  Agent Albin therefore grabbed Mr. Watson by his left arm once he was within two or three

8  feet, turned him around, grabbed his right arm and told him to stand still so he could lead Mr.

9  Watson out of the hallway and allow the search to proceed.  *Id.* ¶ 10(c).  Mr. Watson pulled his arm

10  away and became combative, saying "What are you doing?  I am not on probation" and "Get your

11  hands off of me, I am not on probation."  *Id.* ¶ 10(d).  Mr. Watson then swung his left arm in an

12  attempt to hit Agent Albin, leading Agent Albin to grab Mr. Watson by his right armpit and force

13  him to the kitchen floor, face down.  *Id.* ¶ 10(e).  While on the floor, Mr. Watson struggled, kicked

14  his legs, yelled and screamed while another agent helped Agent Albin secure and handcuff him.

15    Agent Albin states that he had no contact with Daniel Farias or Lauren or Nicole Watson.  *Id.*

16  ¶ 8.

17    Agent Albin's contemporaneous narrative report is consistent with his declaration, though it

18  adds further detail about the struggle and the aftermath.  *See* Waldron Decl., Ex. G at 4:4-5:12.

19  When Mr. Watson hit the kitchen floor, the fall trapped both of his hands and Agent Albin's left arm

20  beneath Mr. Watson's body.  *Id.* at 4:8-9.  To free his left arm and Mr. Watson's hands, Agent Albin

21  punched Mr. Watson's left shoulder and back four to six times.  *Id.* at 4:9-13.  Blood appeared on the

22  floor, and Agent Albin believed it came from Mr. Watson's mouth.  *Id.* at 4:13-14.  Eventually, Mr.

23  Watson was detained and, in total, the struggle last around five minutes.  *Id.* at 5:9-10.  Agent

24  Mendez then photographed the scene, Mr. Watson, and Agent Albin.  *Id.* at 5:10-11.[2]

25    **3.    Agent Rubino's Declaration**

26  _____

27  [2]    Two of the photographs are in the record.  *See* Waldron Decl., Exs. I, J.  One shows Mr. Watson with a bloodied face.  *Id.* at Ex. I.  The other shows a tile floor with blood spattered on it. *Id.* at Ex. J.

28

1    Agent Rubino states that he was one of the last agents to enter the house.  Rubino Decl. ¶ 10.

2   He and Agent D'Antonio passed through the kitchen and secured the family room, where they

3   contacted an elderly couple – Ann and Earnest Farias.  *Id.* ¶ 11.  Agent Rubino identified himself

4   and the purpose of the search.  *Id.* ¶ 12.

5    While in the family room, he heard noise from the kitchen.  *Id.* ¶ 13.  He entered the kitchen,

6   where he saw Mr. Watson on the floor fighting with Agent Albin.  *Id.*  Agent Rubino helped Agent

7   Albin handcuff Mr. Watson.  *Id.* ¶ 13.  Agent Rubino states that while he was in the family room, he

8   does not know what happened in the kitchen or in the entry hallway.  *Id.* ¶ 14.  He also states that he

9   had no contact with Daniel Farias or Lauren Watson.  *Id.* ¶ 15.

10   **4.    Dwight Watson's Declaration**

11    Dwight Watson states that he never tried to "hit, elbow, or otherwise resist" any officer

12   during the search.  Docket No. 91, Decl. of Dwight Watson ¶ 3.  Mr. Watson was suffering from "an

13   excruciatingly painful back condition" at the time such that it took him about twenty seconds to walk

14   the ten feet from his room to where Agent Albin was standing.  *Id.* ¶¶ 5, 6.  Mr. Watson did not have

15   any gun or weapon.  *Id.* ¶ 7.  In his deposition, Mr. Watson testified that the only thing he said to the

16   officers was "you must be here for Curt."  *See* Waldron Decl., Ex. A at 58:2-8; 59:8-13.  He stated

17   that he did not yell at the officers.  *Id.*, Ex. A at 60:10-17.

18   **C.    The Prosecution of Dwight Watson**

19    Mr. Watson was charged with resisting arrest.  Watson Decl. ¶ 8.  A jury acquitted him on all

20   counts.  *Id.*

21   **D.    The Filing of This Lawsuit**

22    Prior to filing this lawsuit, the plaintiffs made demands on State of California, Santa Clara

23   County, and the City of Campbell.  *See* Docket No. 1, Compl. ¶ 5.  The plaintiffs did not make a

24   demand on the City of San Jose.  *See* Docket No. 72, Decl. of James Brennan, ¶¶ 4-6.  When Agent

25   Albin filed his answer to the complaint, he asserted that the plaintiffs failed to comply with

26   California's claims filing requirements.  *See* Docket No. 26, Answer of Glenn Albin, at p. 9 (Mar.

27

28

**United States District Court**
For the Northern District of California

27, 2007).  Agent Albin admitted that he was a member of SCCSET, but did not reveal that he was a

member of the San Jose Police Department.  *See id.* ¶ 10; *compare with* Compl. ¶ 10.

## II.  ANALYSIS

### A.  Mr. Watson's False Arrest Claims Against Agents Albin and Rubino

Agent Albin moves for summary judgment on Mr. Watson's claim section 1983 claim for

false arrest, arguing that he is entitled to qualified immunity because he reasonably believed there

was probable cause for arresting Mr. Watson for resisting arrest.  Mr. Watson points out that this

may be so – if the SCCSET agents' versions of what happened inside the Watson home are true.  Mr.

Watson has introduced evidence that he never yelled at the officers, that he did not physically resist

Agent Albin, and that he was in too much pain from his back injury to have put up a fight.  Agent

Albin argues that the "tense, fast moving events" of the SCCSET raid made Agent Albin's actions

reasonable.  This is possible.  Indeed, the SCCSET raid began by detaining two youths (who were

not part of Mr. Watson's family) loitering in front of the garage and netted a wide variety of

contraband and drug paraphernalia from Curtis Farias' room.  On the other hand, the evidence taken

in the light most favorable to Mr. Watson suggests that Mr. Watson greeted the agents by calmly

stating "you must be here for Curt," that he never raised his voice, and that as he was forced to the

ground and punched in the shoulder, he never resisted.  Under those circumstances, Agent Albin's

arrest of Mr. Watson for resisting arrest would not be reasonable; indeed, it would have been

"plainly incompetent" or a knowing violation of constitutional law.  *Spiegel v. Cortese*, 196 F.3d

717, 723 (7th Cir. 2000) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  The jury, not the

court, must determine which version of events is the truth.  *Wall v. County of Orange*, 364 F.3d

1107, 1110 (9th Cir. 2004).

Agent Rubino similarly moves for summary judgment on Mr. Watson's section 1983 claim

for false arrest based on qualified immunity.  The only evidence bearing on Agent Rubino's role in

the incident is his admission that he helped Agent Albin handcuff Mr. Watson.  As discussed

regarding Agent Albin's actions, if Mr. Watson's version of events is true, the SCCSET agents had

no reason to physically subdue and handcuff Mr. Watson and Mr. Watson did nothing to resist the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  agents.  Agent Rubino cites to *Dawson v. City of Seattle*, 435 F.3d 1054 (9th Cir. 2006), where the

2  Seattle Police detained the tenants for a boardinghouse for two hours while the house was searched

3  for pest infestations.  The Ninth Circuit there held that a detention of a building's occupants incident

4  to a lawful search is reasonable, but that the government does not have "unfettered authority to

5  detain a building's occupants in any way they see fit."  *Id.* at 1066.  To be sure, SCCSET was

6  justified in detaining the Watson family in the living room during Agent Mendez's search of the

7  house.  *Accord id.* at 1068 ("[I]t was reasonable to assemble tenants in a suitable place at the earliest

8  practical opportunity in order to facilitate the inspection and its completion.").

9       But interpreting the evidence in the light most favorable to Mr. Watson compels the finding

10  that his detention was not similarly justifiable.  Agent Albin wrestled Mr. Watson to the ground

11  despite Mr. Watson's compliance, and Agent Rubino assisted in handcuffing him despite Mr.

12  Watson's continued lack of resistance and complaints of pain.  The SCCSET agents then arrested

13  him for resisting arrest.  If proven, this is not a simple detention incident to a search.  Instead, it is

14  more analogous to the unreasonable detention described in *Tekle v. United States*, 511 F.3d 839 (9th

15  Cir. 2007), where an eleven-year old-boy was handcuffed and held at gunpoint while federal agents

16  searched his home to arrest his father.  While the search in this case had the potential to be

17  dangerous, the evidence submitted by Mr. Watson portrays a calm home invaded by special agents

18  despite having already arrested the person believed to be dealing drugs and knowing that the house

19  was occupied by children and elderly adults.  Under these circumstances, there is a triable issue as to

20  whether Agent Rubino acted reasonably in assisting Agent Albin in arresting Mr. Watson.[3]

21       **B.  Malicious Prosecution**[4]

22       Agent Albin also moves for summary judgment on Mr. Watson's section 1983 claim of

23  malicious prosecution arising out of Mr. Watson's prosecution for resisting arrest.  "Filing of a

24

25  _____

26  [3]     Because the court has found that there are triable issues of fact regarding the reasonableness of Agent Rubino's conduct, the court similarly cannot grant summary judgment on Mr. Watson's state law claim under California Civil Code section 52.1.

27  [4]     While the complaint accuses Agent Rubino of malicious prosecution, the plaintiffs no longer

28  assert such a claim against Agent Rubino.

**United States District Court**
For the Northern District of California

1   criminal complaint immunizes investigating officers . . . from damages suffered thereafter because it

2   is presumed that the prosecutor filing the complaint exercised independent judgment in determining

3   that probable cause for an accused's arrest exists at that time." *Smiddy v. Varney*, 665 F.2d 261, 266

4   (9th Cir. 1981). The presumption may be rebutted if, for example, it is shown that the investigating

5   officers knowingly submitted false information to the prosecutor. *Id.* at 266-67.

6          In this case, Agent Albin prepared a report describing the events leading to Mr. Watson's

7   arrest for resisting arrest and an affidavit to support charging Mr. Watson with resisting arrest. *See*

8   Waldron Decl., Exs. G, N. In both documents, Agent Albin describes how Mr. Watson became

9   agitated, yelled, and fought as Agent Albin tried to subdue him. Mr. Watson has testified that these

10   statements are false, as well demonstrated various inconsistencies in the agents' recount of the

11   struggle. If Mr. Watson's evidence is believed, it follows that Agent Albin likely perjured himself in

12   preparing an affidavit to charge Mr. Watson with resisting arrest.

13          Agent Albin correctly points out that malicious prosecution claims are generally not

14   cognizable under section 1983. *Bretz v. Kelman*, 773 F.2d 1026, 1031 (9th Cir. 1985) (en banc).

15   Such claims only fall under section 1983 if the prosecution was intended "to deprive a person of

16   equal protection of the laws or . . . otherwise intended to subject a person to a denial of

17   constitutional rights." *Id.* It appears that incarceration is a sufficient denial of the constitutional

18   right to liberty to permit this type of malicious prosecution claim under section 1983. *See id.*;

19   *Blankenhorn v. City of Orange*, 485 F.3d 463, 483-84 (9th Cir. 2007) (reversing district court's

20   dismissal of malicious prosecution claim under section 1983 where plaintiff introduced evidence

21   suggesting that he did not resist arrest). Accordingly, the court cannot grant summary judgment

22   because Mr. Watson has rebutted the presumption of prosecutorial independence by producing

23   evidence that the Agent Albin's reports that Mr. Watson resisted arrest are knowingly false.

24          **C.      The Claims Presentation Requirement**

25          California law requires a plaintiff to present its claims against a government employee to the

26   employing entity before allowing suit. Cal. Gov. Code §§ 950.2, 950.6. In this case, the plaintiffs

27

28

ORDER DENYING AGENT ALBIN'S AND AGENT RUBINO'S MOTIONS FOR SUMMARY JUDGMENT
No. C-06-07767 RMW
TSF

1   made timely claims on the State of California, County of Santa Clara, and City of Campbell, but that

2   plaintiffs have never made a claim on the City of San Jose, Agent Albin's employer.

3        The plaintiffs invoke California Government Code section 950.4, a statutory exception to

4   section 950.2.  As the statute is not a model of clarity, it is reproduced in its entirety with line breaks

5   added to illustrate the relationship between the clauses:

6        A cause of action against a public employee or former public employee is not barred by
    Section 950.2 if the plaintiff pleads and proves that he did not know or have reason to

7   know,

8             within the period for the presentation of a claim to the employing public
    entity as a condition to maintaining an action for such injury against the

9   employing public entity,

10                 as that period is prescribed by Section 911.2 or by such other claims
    procedure as may be applicable,

11

12       that the injury was caused by an act or omission of the public entity or by an act or
    omission of an employee of the public entity in the scope of his employment as a public

13  employee.

14  A first point worth noting is that section 950.4 refers to *the* employing public entity, not *an*

15  employing public entity.  *See Moore v. Morhar*, 65 Cal. App. 3d 896, 902 (1977) (noting that section

16  950.4 requires knowledge or reason to know regarding "the specific public entity chargeable with

17  the harm").  The difference is significant in cases like this where the plaintiff is aware that they have

18  been harmed by the government, but not aware of the specific entity that has harmed them.  In such

19  cases, section 950.4 still applies to excuse a plaintiff's failure to file a claim if the plaintiff lacked

20  knowledge or reason to know the specific entity that harmed them.

21       A second feature of section 950.4 is that it requires the plaintiff to prove that he "did not

22  know or have reason to know" that his injury was caused by the specific public entity.  The law

23  therefore requires a plaintiff to prove that he exercised reasonable diligence in ascertaining the facts

24  regarding his injury.  *Moore v. Morhar*, 65 Cal. App. 3d 896, 902 (1977); *see also* 1 CALIFORNIA

25  GOVERNMENT TORT LIABILITY PRACTICE § 5.63 (4th ed. 2008).  In *Moore*, the plaintiff was injured

26  by an allegedly defective sidewalk.  *Id.*  The plaintiff believed that her injury occurred within city

27  limits, but in fact, the curb was just outside city limits and the county was responsible.  *Id.*  The

28  California Court of Appeal affirmed the trial court's dismissal because the plaintiff was not

1    reasonably diligent in determining who caused her injuries, for example, she could have checked a

2    map to determine where her injuries occurred.  *Id.*

3         Agent Albin argues that the plaintiffs were not reasonably diligent in failing to discover that

4    he worked for the San Jose police department.  Unlike in *Moore*, the plaintiffs could not determine

5    which public entity should be served with a claim by simply looking at a map.  All of the reports

6    available to the plaintiffs indicate that Agent Albin was a SCCSET agent and did not reveal that he

7    was employed by the San Jose police department.  Tellingly, Agent Albin does not explain how the

8    plaintiffs could have figured out he worked for San Jose, as opposed to Santa Clara County.  Based

9    on the record before the court, the plaintiffs have introduced evidence that there is a triable issue of

10   fact as to whether the plaintiffs have met the reasonable diligence standard.

11        What is unclear is what effect section 950.4 has on plaintiffs' claims if it applies.  Plaintiffs

12   argue that if they lacked knowledge of the specific public entity that caused their injury during the

13   initial six-month window for presenting a claim,[5] they are excused from the claim filing requirement

14   in its entirety.  To be sure, the court in *Moore* stated that "a claimant who becomes chargeable with,

15   or acquires, knowledge under section 950.4 during the period in which a *late claim* could be filed,

16   may not be barred from proceeding against a public employee, even though his claim against the

17   employing public entity is barred."  *Moore*, 65 Cal. App. 3d 901-02 (emphasis in original) (footnotes

18   omitted).  The plaintiffs interpret this language to suggest that a plaintiff who lacks knowledge or

19   reason to know during the initial six-month claims period *never* needs to submit a claim to the

20   employing public entity.  This interpretation appears to be shared by the leading treatise in the area.

21   *See* 1 CALIFORNIA GOVERNMENT TORT LIABILITY PRACTICE § 5.63 (4th ed. 2008).

22        Overlooked by the plaintiffs and the treatise, however, is the footnote in *Moore* qualifying

23   the court's quoted statement:

24        Although this seems to give an unwarranted procedural advantage to the claimant against
         a public employee, Van Alstyne reasons as follows: "... since the ground of the late claim
25       application ordinarily would be one for which broad discretion is vested in the trial court,
         such as disability (see § 8.31) or inadvertence (see § 8.29), denial of the application
26       should not necessarily preclude the claimant from maintaining his action against the

27

28   _____
     [5]    California Government Code section 911.2(a) imposes a six-month time limit on filing
     claims against the state government for personal injury.

ORDER DENYING AGENT ALBIN'S AND AGENT RUBINO'S MOTIONS FOR SUMMARY JUDGMENT
No. C-06-07767 RMW
TSF                                                    10

United States District Court
For the Northern District of California

United States District Court<br>For the Northern District of California

public employee. To hold to the contrary would leave claimant's initial ignorance of the tortfeasor's public employment status as the real basis for his inability to litigate his cause of action. This is precisely the kind of unjust result the legislature was seeking to prevent. *But an application to present the late claim and its denial should be required at least.*"

*Moore*, 65 Cal. App. 3d at 902 fn. 5 (emphasis added).  The final line of the footnote plainly states that a late claim must still be made on the public entity and that if it is denied, section 950.4 can provide a justification for excusing the denied claim.  With this context, it appears that *Moore* holds only that section 950.4 provides an excuse for suit despite a denied late claim.  This generally squares with the claims statute's overarching purpose of providing timely notice to a public entity of claims against it.

Notwithstanding the *Moore* decision and the policy at stake, the statute is clear: a cause of action is not barred by the provision requiring a plaintiff to file a claim (section 950.2) if the plaintiff lacked knowledge or reason to know of the specific entity that harmed it during the six-month claim presentation time frame.  This may lead to an absurd result where a plaintiff discovers the public entity responsible for their injury a day after the six-month period and is nonetheless free from ever filing a claim against the entity, but this is the result compelled by the text.  At trial, the plaintiffs must prove that their investigation (which appears to have consisted of reading the police report) was reasonably diligent.  If they succeed, their failure to ever file a claim with the city of San Jose will be excused.[6]

**D.    The Children's Claims**

Finally, Agents Albin and Rubino move for summary judgment as to the claims asserted by the children, Daniel Farias and Lauren and Nicole Watson.  While the plaintiffs' complaint does not clearly state which plaintiffs assert which claims, fairly read, the children do not asset a claim against Agent Rubino.  The only claim asserted by the children against Agent Albin is their claim for intentional or negligent infliction of emotional distress.

---

[6]    While portions of this analysis track some of the argument in plaintiffs' unsolicited letter brief of April 14, 2008 (docket no. 115), the court did not consider plaintiffs' letter brief.  The court did not grant leave to submit additional briefing and therefore sustains Agent Albin's objection (docket no. 118) to the letter brief.

1     Agent Albin argues that because he had no contact with the children, he cannot be liable for

2  inflicting emotional distress upon them.  California law does not require physical contact in this type

3  of situation.  *See, e.g., Carrasco v. City of Vallejo*, 2001 WL 34098655, at *8 (E.D. Cal. 2001)

4  (mother's emotional distress claim arose from witnessing her son's beating by police).  Accordingly,

5  Agent Albin's motion for summary judgment is denied.

6                                        **III.   ORDER**

7     For the foregoing reasons, the court denies the motions for summary judgment.

8

9   DATED:     4/16/2008

10                                            RONALD M. WHYTE
                                             United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

1    **Notice of this document has been electronically sent to:**

2    **Counsel for Plaintiffs:**

3    Sunil R. Kulkarni           skulkarni@mofo.com
     Mark William Martel         markmartel@aol.com
4    KC Waldron                  kcwaldron@mofo.com

5    **Counsel for Defendants:**

6    Jennifer C. Addams          jennifer.addams@doj.ca.gov
     Mark F. Bernal              mark.bernal@cco.sccgov.org
7    Michael J. Dodson           cao.main@sanjoseca.gov
     Wilfred T. Fong             wil.fong@doj.ca.gov
8    James Thomas Gotch          gotchj@stubbsleone.com
     Claudia Leed                leedc@stubbsleone.com
9    Louis A. Leone              lleone@stubbsleone.com
     Timothy James Schmal        TSchmal@bvsllp.com

10
     Counsel are responsible for distributing copies of this document to co-counsel that have not
11   registered for e-filing under the court's CM/ECF program.

12

13   **Dated:**      4/16/2008                              TSF
                                                  **Chambers of Judge Whyte**
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER DENYING AGENT ALBIN'S AND AGENT RUBINO'S MOTIONS FOR SUMMARY JUDGMENT
No. C-06-07767 RMW
TSF                                                    13