*E-filed 5/12/08*

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DWIGHT WATSON; DANIEL FARIAS; LAUREN WATSON; and NICOLE WATSON, <br><br> Plaintiffs, <br><br> v. <br><br> GLENN ALBIN; DAVID MENDEZ; FRANK ST. CLAIR; MIKE D'ANTONIO; MIKE RUBINO; SANTA CLARA COUNTY; STATE OF CALIFORNIA, and DOES 1-50, <br><br> Defendants. | No. C-06-07767 RMW <br><br> **ORDER ON DEFENDANT'S MOTION TO COMPEL AND MOTION FOR ATTORNEY'S FEES** <br><br> Re: Docket Nos. 84 and 86 |

The allegations in plaintiffs' complaint stem from a probation search conducted by the Santa Clara County Specialized Enforcement Team. The plaintiffs are Dwight Watson and his three children: Daniel Farias, Lauren Watson and Nicole Watson. The only remaining defendant is agent Glenn Albin. A jury trial is set to begin on May 19, 2008. Defendant moves to compel certain discovery and for attorney's fees. Having considered the papers and arguments of counsel, the court orders as follows:

**I.  MOTION TO COMPEL**

Following the probation search, Watson was incarcerated in a Santa Clara County jail. One of the original defendants (who has since been dismissed) issued a subpoena to the Santa Clara

1  County Department of Corrections (DOC) for the release of telephone call recordings made by
2  Watson to his family's residence. The DOC objected to the subpoena because the conversations
3  might contain privileged information. Thereafter, the parties agreed to have the recordings released
4  to plaintiffs' counsel to review them for "attorney-client privileged or personal privacy
5  communications." After that review, plaintiffs produced some conversations, but withheld others
6  on the basis of privilege. The withheld recordings are the subject of the motion to compel.

**1.     Marital Communication Privilege**

Defendant Albin was understandably surprised when he received plaintiffs' privilege log listing the redaction of twenty-one conversations on the basis of a marital communications privilege. To begin, Dwight Watson and Margaret Farias admit that they have never entered into a formal marital contract or had a legally recognized marriage ceremony. And, when the parties agreed to the review of the recordings, plaintiff's counsel made no mention of marital privilege. Despite this, plaintiffs say the redaction was proper because Watson and Farias formed a common law marriage while living in Washington D.C. which is legally recognized in California. They argue that these conversations were thus protected by the marital communications privilege.

In order to assert the marital communicational privilege there must be a valid and viable marriage. *See United States v. Lustig*, 555 F.2d 737, 747-48 (9th Cir. 1977). In addition, the communication must be made in confidence. *See e.g., United States v. Strobehn*, 421 F. 3d 1017 (9th Cir. 2005). Although common law marriages cannot be formed under California law, if validly formed in another jurisdiction then such a marriage would be recognized here. *Colbert v. Colbert*, 28 Cal. 2d 276, 280 (1946) (common law marriages legally created in other states are recognized).

**a)     Did Watson and Farias have a "valid and viable marriage"?**

Under Washington D.C. law, a common-law marriage can be established by cohabitation as husband and wife, which follows an expressed mutual agreement which must be in words of the present tense. *See Mesa v. United States*, 875 A.2d 79, 83 (D.C. 2005); *see also Dickey v. Office of Personnel Management*, 419 F.3d 1336, 1340 (Fed. Cir. 2005). However, in *Coates v. Watts*, the court held that "since ceremonial marriage is readily available and provides unequivocal proof that

2

the parties are husband and wife, claims of common-law marriage should be closely scrutinized."
622 A.2d 25, 27 (D.C. 1993).

Plaintiffs rely on two forms of evidence to establish of a common law marriage between Watson and Farias: (1) the declarations of Dwight Watson, Beatrice Watson (Dwight's mother), and Margaret Farias,[1] and (2) the deposition testimony of Watson and Farias. No extrinsic evidence supporting the existence of a marriage was submitted.

According to the declarations, Watson and Farias began dating in 1988, had their first son (Daniel Farias) in 1990 while living in California, and lived in Washington D.C. from October 1992 to January 1994. It was during this relatively short time in D.C. that the two say they "agreed to live together as husband and wife indefinitely." Their second daughter was born January 20, 1994 in Alabama. Apparently, she was born "Lauren Farias," but a few days later Watson and Farias had the hospital change Lauren's last name to Watson. The deposition testimony indicates that the two believe they have a common law marital arrangement, but also shows that Watson and Farias do not consistently hold themselves out to be husband and wife. The testimony does not shed any light on how or when the supposed marriage began.

Based on the evidence, the court is skeptical that a valid common law marriage was formed between Watson and Farias. However, the marriage question need not be resolved. Even assuming that a valid and viable marriage exists, the court finds (as set forth below) that the communication lacked the requisite confidentiality for the privilege to apply.

**b)     Were the monitored telephone conversations "confidential"?**

Communications made in the presence of a third party are generally not made in confidence, and thus, not protected by the spousal communications privilege. *Wolfle v. United States*, 291 U.S. 7 (1934). The marital communication privilege requires the communications be made with the intention of confidence. *Id.* at 13. If it appears from the nature of the communication or the circumstances under which it is made that it was not intended to be

---

[1] After the reply was filed, plaintiffs submitted a declaration from Margaret Farias. Defendant objected. Although plaintiffs should have sought leave to file this declaration, good cause has been shown to permit its consideration here.

3

confidential, then this will not constitute privileged information. *Id.* at 14. The subject conversations were made on a monitored telephone line at the jail facility. Therefore, the court must decide whether the presence of the recording device is the "functional equivalent of the presence of a third party." *United States v. Lentz*, 419 F.Supp.2d 820, 828-29 (E.D.Va. 2005).

When Watson entered the DOC facility, he signed a document with the statement:

> I fully understand that if I choose to use the inmate telephones in any of the Santa Clara County Department of Correction jail facilities, I am doing so with the knowledge that the telephone call may be monitored and/or recorded.

All inmate telephones had signs posted above them advising that all calls may be monitored or recorded. Furthermore, the introductory message on all inmate telephone calls from this facility advises the calling or called parties that the call may be monitored or recorded.

Plaintiffs first take issue with the "random" aspect of this monitoring policy, arguing that it was uncertain which calls would be monitored. This argument is unpersuasive given the "well-known need for correctional institutions to monitor inmate conversations." *United States v. Madoch*, 149 F.3d 596, 602 (7th Cir. 1998). Furthermore, the Santa Clara County DOC policy language is identical to the policies in other cases addressing privacy interests as related to prison phone calls. All of those cases found, either implicitly or explicitly, that this language was sufficient to put a caller on notice that the communication would not be private.

Plaintiffs next argue that the potential for the call to be monitored is the equivalent of an eavesdropper. They then cite to a California case for the authority that the presence of an eavesdropper does not destroy the marital communication privilege. *North v. Super. Ct.*, 8 Cal. 3d 301, 310-12 (1972). However, that case is factually distinguishable.[2] Significantly, it noted that under California law, "ordinarily the fact that a communication is made under circumstances where others could easily overhear is a strong indication that the communication was not intended to be confidential and is, therefore, unprivileged." *Id.* (internal citations omitted).

---

[2] In *North,* a husband and wife were offered a detective's private office to have a conversation under circumstances which seemed to show that the couple were "lulled into believing that their conversation would be confidential." On those facts, the marital communications privilege was not waived, despite the presence of an "eavesdropper."

4

The final argument made by plaintiffs is that the marital privilege should not be defeated for lack of confidentiality where Watson had no means of communicating with Farias except on the monitored phone line during his time in prison.  (The unmonitored phone lines were only available for pre-approved calls made to the inmate's attorney.)  It appears that this privilege question has not yet been addressed in this circuit, although other circuit courts and district courts have considered it.  The overwhelming theme from those cases is that an inmate should recognize that any "privacy interests ... in telephone calls placed from a jail facility are tenuous." *United States v. Solomon*, 2007 WL 2702792 (unpublished) (W.D.Pa. 2007) (denying a motion to suppress jail phone calls, court found no reasonable expectation of privacy with recording of calls from prison to non-attorneys).  Cases specifically addressing the spousal privilege question have found that for conversations on monitored prison phone lines, the marital communications privilege is waived for lack of confidentiality. *See e.g., Madoch*, 149 F.3d at 602 (holding that the marital communications privilege did not apply where the wife knew that her husband was in jail when they spoke over the phone).

Furthermore, the Ninth Circuit has considered the privacy interests of inmates on monitored phone lines in the Fourth Amendment context and of spousal privilege implications for written correspondence.  These cases are instructive.  In a case dealing with Fourth Amendment rights, the Court found that the defendant did not have a reasonable expectation of privacy in outbound phone calls made from the facility.[3] *United States v. Van Poyck*, 77 F.3d 285, 290-91 (9th Cir. 1996), *cert denied,* 519 U.S. 912 (1996).  The court noted that Van Poyck knew of the monitoring policy before making phone calls and that under such circumstances, "it is hard to believe he thought his calls were private." *Id.*  Furthermore, "[e]ven if Van Poyck believed that his calls were private, no prisoner should reasonably expect privacy" in those circumstances. *Id.*  In *United States v. Griffin,* the Court mentions that California state law does not provide an inmate with a right to correspond confidentially with his or her spouse.  440 F.3d 1138, 1144 (9th Cir.

---

[3] As discussed in the attorney-client privilege section, this statement was qualified in a footnote for calls made to an attorney on unmonitored lines. *Van Poyck*, 77 F.3d at 291, n. 9.

5

2006). Although "correspondence" in that context referred to written correspondence sent through the mail and the court relied in part on a California regulation authorizing authorities to read outgoing mail, the situation here is certainly analogous.

The evidence suggests that Watson was on notice that the conversations were being recorded and that Watson and Farias could not reasonably expect their conversations to remain private. The recording device operated as the "functional equivalent" of the presence of a third party. Accordingly, the motion is GRANTED as to the marital communications privilege redactions. Plaintiffs shall produce the documents by May 14, 2008.

      **c)**     **Alternatively, assuming a privilege applies, was it otherwise waived?**

Defendant also says that plaintiffs waived the marital communications privilege by failing to object during Margaret Farias' deposition to questions about conversations between Farias and Watson while he was incarcerated.[4] Because of the finding that the communications were not confidential, the court need not reach this alternative argument.

**2.**     **Attorney-Client Privilege Redactions**

Portions of five conversations were redacted on the basis of attorney-client privilege. These recordings were the subject of an interim order by this court. [Docket No. 139]. Pursuant to that order, plaintiffs produced the conversations for *in camera* review. It had been argued that although no attorney was present, these redacted conversations fell within the "joint prosecutorial" or "common interest" realm of the attorney-client privilege. *See Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308, 310-312 (N.D. Cal. 1987). Upon review, it has been determined that some of the conversations fall within the joint prosecutorial doctrine.

However, because these conversations were over the monitored phone line, questions over the confidentiality must be resolved. The confidentiality analysis in the attorney client privilege context differs slightly from the spousal privilege analysis because courts are typically more protective of the attorney-client privilege. For this reason, most correctional facilities (including

---

[4] After this motion was argued and under submission, defendant filed a supplemental declaration on this issue. Plaintiffs objected. Good cause was not shown for leave to file that late declaration and it will not be considered here.

6

the Santa Clara County DOC) have an alternative unmonitored phone system for when inmates have conversations with attorneys.

Plaintiffs say that because the monitored system was the only means for Watson to communicate with his co-plaintiffs while incarcerated, the attorney-client privilege should not be waived. As with the prior discussion in the spousal privilege context, relevant caselaw is instructive, but not necessarily controlling. For example, the Eighth Circuit reversed a trial court decision upholding attorney-client privilege, holding that prisoners and their attorneys had no reasonable expectation of privacy since they knew their conversations were being recorded. *United States v. Hatcher*, 323 F.3d 666, 674 (8th Cir. 2003). Two district court reached similar conclusions. *Lentz*, 419 F.Supp.2d at 828-29 (inmate's telephone conversations with counsel are not protected by attorney-client privilege where, as here, the inmate is notified the calls are recorded and subject to monitoring); *United States v. Eye*, (unpublished opinion) No. 05-00344-01 CRW, 2008 WL 1701089, *12 (W.D.Mo. 2008) (defendant waived attorney-client privilege by communicating with his attorney on the prison phones because facility provided notice - by informing defendant upon his arrival, through signs on the telephones, and via a recorded message prior to calls - that calls were subject to monitoring and recording). These cases indicate that despite the strong protections typically afforded attorney-client privilege, if an inmate calls an attorney on a monitored phone line, the privilege will be waived for lack of confidentiality. *Lentz*, 419 F.Supp.2d at 828-29 ("While recognizing the fundamental importance of the [attorney-client] privilege, courts have nonetheless been careful not to stretch its application to circumstances beyond its rationale").

Even the case cited by plaintiffs, *United States v. Pelullo*, appears to support finding waiver of the privilege here. 5 F.Supp. 2d 285, 289 (D.N.J. 1998). In *Pelullo*, a defendant was at a facility with a phone monitoring policy similar to the DOC's. The defendant made phone calls on the monitored phone line to non-attorneys and then an attorney was placed on the line. The district court rejected the defendant's claim of privilege to those conversations, noting "to the extent that defendant engaged in telephone conversations with attorneys on the monitored line the communications were not privileged." Finally, a footnote in the Ninth Circuit decision *Van Poyck*

7

1  also supports waiving the privilege under the facts presented. 77 F.3d at 290-91. There, the court
2  noted that "no prisoner should reasonably expect privacy in his outbound telephone calls." *Id.*
3  However, in a footnote this was qualified to exclude "'properly placed' telephone calls between a
4  defendant and his attorney, which the [facility] does not record or monitor." *Id.* at 291, n. 9. Thus, it
5  the key factor was whether the calls were on a monitored or unmonitored phoneline.

6  Here, we are not dealing with a "properly placed telephone call" on an unmonitored line.
7  This was a conversation between family members (who are co-plaintiffs) on a monitored phone
8  line. To be fair, Watson had no unmonitored means of engaging in this kind of conversation. But,
9  as was the case with the marital communications privilege, that unfortunate reality does not mean
10 that the lack of confidentiality must be ignored. Watson knew that any phone calls he made on that
11 line were subject to monitoring or recording. To find that these conversations fall within the narrow
12 confines of attorney-client privilege would be a tenuous application of that legal doctrine. The
13 motion to compel, as to the conversations redacted for joint prosecutorial privilege, is GRANTED.
14 Plaintiffs shall produce the documents by May 14, 2008.

15 **II.    MOTION FOR ATTORNEY'S FEES**

16 Defendant seeks $1,400 in attorney's fees under Fed. R. Civ. P. 37(a)(4)(A). According to
17 Albin, plaintiffs (1) refused to abide by a stipulation entered into by the parties and acted
18 improperly in not submitting the stipulation to the court for approval as an order, (2) "stonewalled"
19 the meet and confer process, and (3) were not substantially justified in refusing to produce the
20 recordings.

21 The first two claims are not substantiated by the record. Moreover, plaintiffs were
22 substantially justified in asserting their position, even if the court did not ultimately agree with it.
23 The motion for sanctions in the form of attorney's fees is DENIED.

24 **IT IS SO ORDERED.**

25
26 Dated: 5/12/08

HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

8

**United States District Court**
For the Northern District of California

1  THIS SHALL CERTIFY THAT A COPY OF THIS ORDER WILL BE SENT TO:

Jennifer C. Addams jennifer.addams@doj.ca.gov, chere.deuel@doj.ca.gov

Mark F. Bernal mark.bernal@cco.sccgov.org

Michael J. Dodson cao.main@sanjoseca.gov

Wilfred T. Fong wil.fong@doj.ca.gov

James Thomas Gotch gotchj@stubbsleone.com

Sunil R. Kulkarni skulkarni@mofo.com, msousa@mofo.com

Claudia Leed leedc@stubbsleone.com, suttonk@stubbslx eone.com

Louis A. Leone lleone@stubbsleone.com, suttonk@stubbsleone.com

Mark William Martel markmartel@aol.com

Timothy James Schmal , Esq TSchmal@bvsllp.com, jpl@bvsllp.com

KC Waldron kcwaldron@mofo.com, klarson@mofo.com


\* Counsel are responsible for providing copies of this order to co-counsel.

Dated:  5/12/08

                                             /s/ KRO
                                   Chambers of Magistrate Judge Lloyd